FILED

2013 May-23  AM 11:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

TONY KIRBY,

      PLAINTIFF,

VS.                           CASE NO.: CV-12-J-3629-NE

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

      DEFENDANT.

## MEMORANDUM OPINION

This matter is before the court on the record. This Court has jurisdiction pursuant to 42 U.S.C. § 405.  The plaintiff is seeking reversal or remand of a final decision of the Commissioner.  All administrative remedies have been exhausted.

### Procedural Background

The plaintiff applied for Disability Insurance Benefits and Supplemental Security Income on August 16, 2006 (R. 127-136), alleging an inability to work since February 14, 2006 (R. 127), due to back pain from an injury and depression[1] (R. 150). The administrative law judge (ALJ) reached a determination that the plaintiff was not disabled at any time through the date of his March 26, 2008, decision (R. 12-21).  The plaintiff appealed this decision to the Appeals Council which denied his request for

---

[1]During his application interview, the interviewer noted that plaintiff "appeared to be in severe pain; very slow answering; seemed unable to grasp question; hard for him to come up with answer; moved in seat a lot had to stand up several times" (R. 160).

review on June 24, 2009 (R. 1-3).  The plaintiff filed an appeal of this determination.

*See Kirby v. Astrue*, 5:09-CV-1462-RDP (R. 536-555).  That appeal ended with a

Memorandum Opinion and Order dated August 25, 2010, affirming the ALJ in part,

reversing the ALJ in part, and remanding the decision to the Commissioner based on

the ALJ's misapplication of the pain standard and unexplained failure to consider the

Vocational Expert's ("VE") testimony.  *Id* (doc. 8), at 20.  Upon return to the

Commissioner, the Appeals Council vacated the final decision of the Commissioner

and ordered an ALJ conduct a new hearing, which was done (R. 467-513, 558).  The

ALJ thereafter issued an opinion again denying the plaintiff benefits  (R. 436-459).

The Appeals Council again considered the plaintiff's reasons for disagreeing with the

ALJ, but again affirmed the hearing decision (R. 419-420).  The ALJ's decision thus

became the final order of the Commissioner.  *See* 42 U.S.C.§ 405(g). This action for

judicial review followed (doc. 1).  The court has considered the entire record and

whether the decision of the ALJ is supported by substantial evidence.  For the reasons

set forth herein, this case is **REVERSED** and **REMANDED.**

## Factual Background

The plaintiff was born on December 21, 1970, and completed high school (R.

37, 471).  He suffered an on-the-job herniated disc which required surgery and for

which he received Workers' Compensation benefits (R. 38, 473, 476).  Immediately

after surgery the plaintiff improved, but gradually got worse (R. 476, 493).  He was

referred for pain management and has been receiving the same ever since (R. 477, 493). Although released back to his job by his treating physician, the plaintiff was not able to perform the same work after his back surgery in 2003 (R. 39). For several years his employer let him perform simple tasks (R. 40-41, 473). When he was told he would have to return to his regular job, the plaintiff quit because he could no longer do that work due to pain (R. 473, 478).

Upon his release back to work, the plaintiff was limited to no lifting over twenty pounds, no stooping, bending or twisting, and the ability to alternate standing and sitting (R. 393, 473). The plaintiff testified that even if he found a job within those limitations, he would not be able to do it because of pain (R. 473-474). He stated

> There's days that, that I barely, that I go from the bed to the recliner. There's been days that I, I can't get out of bed. But I have to be able to, sitting and standing is, that, that's good, but I have to be able to recline at some point in the day and, and it's hard to, it's hard to function when I take my pain medicines. And, plus, I have the traction unit that I have to use three times a day as well.

R. 474.

The pain is in his back, left hip, and left leg all the way down to his foot, which stays numb a lot of times and sometimes hurts (R. 474). The plaintiff is prescribed Lortab, Cymbalta, Celebrex and Ambien (R. 475). He gets relief from the Lortab except when his pain is particularly bad, but it makes him feel "intoxicated" (R. 475,

485).  He has also been prescribed a TENS unit and a traction unit (R. 478).  The traction device, which he uses three times a day, takes about 25 minutes to use, and the plaintiff then needs another 15-20 minutes before he can get up off the floor after using it (R. 479-480).

Plaintiff's doctor for pain management, Dr. James Beretta, has told him that he has a herniated disk and degenerative disc disease (R. 480).  Physical activity such as walking or stooping, riding in a car, or even a hard sneeze, exacerbates his pain (R. 482).  The plaintiff believes he can lift about 20 pounds, but only three or four days a week (R. 481).  On some days, the plaintiff is unable to carry a gallon of milk (R. 481).  The plaintiff also uses a cane to prevent falls from the numbness in his left foot (R. 481-482).  With his cane, the plaintiff estimates he can walk about 20 minutes (R. 483), after which he would have to rest for the same amount of time (R. 484).  He can also sit for 20 to 30 minutes before he needs to stand up (R. 484).  After alternating between sitting and standing for three or four hours, he has to lie down and raise his feet due to pain (R. 491).  On his best day, he could walk about 50 yards without stopping (R. 484).  The plaintiff no longer attends church because all of the sitting hurts (R. 486).  He sometimes needs help to get in and out of the shower (R. 54, 490-491).  When he goes shopping with his wife, he has to use a motorized scooter (R. 55).

The plaintiff was asked if he thought he could work on a steady basis, to which he replied no (R. 60).  The plaintiff's wife testified that the plaintiff tried to work for a long time and when he would work a full day, the next day he would be in so much pain he could not work (R. 71-72).

At the second hearing before an ALJ, Dr. Alan B. Levine testified as a medical expert (R. 498).  He found the medical records of Dr. Beretta lacking and recommended that the plaintiff be examined by a neurologist, orthopedist, or physiatrist, to include an EMG and nerve conduction studies of the lower extremities (R. 498).  However, he also testified that given the medical records as they existed, a 2007 MRI showed only a small herniated disc and nothing reflected nerve root compression or spinal cord compromise (R. 499).  He also noted that Dr. Beretta's medical records were somewhat conflicting, finding 4/5 strength, but also finding 5/5 strength with pain (R. 499).  Dr. Levine also points to medical records prior to 2007 which showed no herniation and hence no explanation for the plaintiff's symptoms (R. 500).  He continued that, if Dr. Beretta's records were accepted as true, then the plaintiff would have to be found to meet Listing 1.04(b) as "epidural fibrosis" is essentially equivalent to arachnoiditis (R. 500).  However, Dr. Levine could find no objective medical evidence to support such a diagnosis (R. 500), hence his belief the plaintiff needed a referral for further testing.  Dr. Levine also spontaneously opined that the plaintiff should be able to lift 15 pounds occasionally, sit for 6 out of 8 hours,

but only in 45 minute increments, stand 4 out of 8 hours, but only in 10 minute increments, and walk for 2 out of 8 hours, but only 30 minutes at a time (R. 501).  He believed the plaintiff needed a sit/stand option and could occasionally climb stairs, kneel, crouch or stoop (R. 501).

Dr.  Levine also opined that the traction device was used by some doctors, but not others, and in his own opinion, had no significant benefit on a long term basis (R. 502).  He recognized that other doctors had different opinions about their use (R. 502).

The VE at the second hearing was asked to assume limitations of those set forth by Dr. Levine with additional limitations of no complex instructions  (R. 505-506).  A hypothetical person with such limitations, including no lifting more than 20 pounds occasionally, could not return to the plaintiff's past relevant work, but would be able to perform such jobs as inspector, laundry classifier, and electrical assembler, all of which exist in significant numbers in the regional and national economies (R. 507).  If the plaintiff was limited to lifting 15 pounds occasionally, positions such as touch up inspector, order clerk and touch up screener would all meet the limitations and exist in significant numbers in the state and national economies (R. 508).[2]  The VE

_____

[2]During the first hearing, the VE was asked to assume limitations of sedentary work with standing and/or walking for 2 hours in an 8 hour work day, sitting for 6 hours in an 8 hour work day, and no complex instructions, based on the State Agency's assigned limitations (R. 76-77). The VE testified that the jobs which allowed for these limitations did not exist in significant

also agreed that the use the traction device during the day, an inability to function clearly after taking Lortab, a need to lie down during the day, and missing two to three days of work per month would each prevent performing any type of substantial gainful employment (R. 510).  The VE noted that where one employer may permit a sit/stand option, another employer might not (R. 511).  Rarely is such an option included in job descriptions (R. 512).  From the first hearing, there was VE testimony that a GAF of 50 would mean that a person is unable to function well enough to maintain steady employment (R. 82).

The medical records reflect that, after his on the job injury, the plaintiff was initially sent to Dr. Jeffery Wade, an orthopaedic surgeon, who performed a bilateral laminectomy and nerve root decompression at L4-5 (R. 235, 296, 385).  Because of plaintiff's continuing pain, Dr. Wade referred the plaintiff to Dr. Beretta for pain management (R. 46, 385).[3]  The plaintiff was also noted to have mild spondylosis at

---

numbers due to the requirement that work be both sedentary and unskilled (R. 78).  However there would be light level jobs which met both the skills and postural limitations, and might include a sit/stand option, except for the lifting requirements of light work (R. 80).

[3]Plaintiff's medical records from Dr. Beretta had to be transcribed due to a lack of legibility.

7

C3-C5[4] (R. 212).   A reference to Dr. Beretta making a finding of ankylosing spondylosis[5] is also contained in the record (R. 62).

Both Dr. Wade's and Dr. Beretta's records reflect ongoing complaints of back pain from falling off a ladder at work in January 2003 (R. 383, 763).   Post-surgery, the plaintiff was given a 10% injury to the body as whole rating and returned to work (R. 386, 763).   The plaintiff also completed physical therapy, where he was noted to have left leg strength of 4/5 and walk with a limp (R. 279-280).   A November 2003 MRI found the L4-5 interverbral disc was chronically degenerated and enhancing scar tissue surrounded the L5 nerve root.   The L3-4 disc was also chronically degenerated and there was a tiny HNP (R. 253).

In February 2004 he complained of pain as an 8 out of 10, and related that he had been off work for three weeks because he hurt to sit, lay or stand (R. 763).   In May 2004 his pain level was unchanged and the records noted he was using a self prescribed cane because he felt unsteady (R. 762).   These records also reflect

---

[4]"Cervical spondylosis is caused by chronic wear on the cervical spine. This includes the disks or cushions between the neck vertebrae and the joints between the bones of the cervical spine.... Symptoms often develop slowly over time, but they may start or get worse suddenly. The pain may be mild, or it can be deep and so severe that you are unable to move." http://www.nlm.nih.gov/medlineplus/ency/article/000436.htm

[5]"Ankylosing spondylitis is a long-term disease that involves inflammation of the joints between the spinal bones, and the joints between the spine and pelvis. These joints become swollen and inflamed. Over time, the affected spinal bones join together.... The disease most often begins between ages 20 and 40, but it may begin before age 10. It affects more males than females....The disease starts with low back pain that comes and goes." http://www.nlm.nih.gov/medlineplus/ency/article/000420.htm

diagnoses of degenerative joint disease and depression (R. 750-761).  The pain in his back was noted to "never quit[]" (R. 722).  A Functional Capacity Evaluation in June 2004 concluded that plaintiff could work in the light range of activity with occasional crawling, stooping and kneeling (R. 264).  A test for symptom magnification was negative (R. 269).  At that time, he was found to be able to stand for 35 minutes with difficulty, sit for 40 minutes with difficulty and walk for 20 minutes with difficulty (R. 274).  A nerve conduction study during the same time period was normal, although tenderness and trigger points were noted, and reflexes were decreased in his knees and ankles (R. 257-261)

The January 2005 record noted the plaintiff had mild to moderate degenerative joint disease at Thoracic 2-3, Thoracic 3-4, and Thoracic 11-12 (R. 721).  The pain was described as "chronic" with a herniated nucleus pulposus in his lumbar back (R. 713, 718, 720).

Plaintiff returned to Dr. Wade in May 2005 because his back pain, leg pain and numbness were getting worse (R. 380).  An October 2005 record from Dr. Wade noted that the plaintiff continues to complain of back and leg pain, and that pain management was not helping plaintiff's chronic pain (R. 244).  However, Dr. Wade told the plaintiff he had no further surgery to offer him, and that he needed to continue in pain management (R. 244).  Beginning in December 2006 the plaintiff

also complained of leg pain (R. 749).  His muscle strength had been 5/5 until that time, when Dr. Beretta noted it as a 4/5 (R.749-763).

The plaintiff's regular treating physician is Dr. Anthony Sims.  He noted the plaintiff's reports of continuous and chronic pain (R. 283, 288).  He recommended plaintiff avoid twisting and extension of his spine, and apply heat 15-20 minutes at a time every 2 to 4 hours (R. 289).

The plaintiff was referred to Dr. Robert Hash by Dr. Sims in March 2006 because of his ongoing pain (R. 295-297).  Dr. Hash noted mild point tenderness in the plaintiff's cervical spine (R. 296).  He noted the plaintiff walked bent over and with an antalgic gait favoring his left leg, had difficulty heel and toe walking due to pain, and that muscle strength was normal (R. 297).  Dr. Hash concluded he did not know if further surgery would be of any benefit to the plaintiff and sent the plaintiff for an MRI (R. 297).   The MRI revealed nothing, and Dr. Hash opined that unless operative lesions were found by a CT scan, he would refer the plaintiff to the Pain Clinic (R. 294).

In March 2007 Dr. Beretta again noted the plaintiff suffered from a herniated disc at L4-5 and still recorded muscle strength as a 4/5 but 5/5 with pain (R. 748).  After sending the plaintiff for an MRI in July 2007, Dr. Beretta's notes show a "plan" of "have traction unit" (R. 679, 746). The MRI report states the plaintiff has a small

central herniation at the L3-L4 intevertebral disc and post-surgical epidural scarring at L4 (R. 679).  It notes "obvious desiccation and degeneration of the L3 and L4 intevertebral discs with small subligamental herniations at both levels, slightly more prominent at L4 (R. 679).  A March 2008 note reflects that the plaintiff "does have traction" (R. 699).

In February and March 2008 Dr. Beretta recorded that the plaintiff had decreased sensation in his lumbar spine and muscle strength was 4/5 (R. 732, 745).  A December 2008 entry states that the MRI reflected a bulging disc, with no spinal stenosis or canal compromise (R. 743).  The plaintiff was prescribed a TENS unit for three weeks in September 2009 (R. 740), but did not receive it until some time in December 2009   (R. 736).   His diagnoses remained unchanged (R. 740).   In December 2009 the records reflect that the plaintiff had a TENS unit (R. 739) and in March 2010 Dr.  Beretta noted that the plaintiff was unchanged and "no better" (R. 730, 738).  From 2010 Dr. Beretta's notes include diagnoses of lumbar herniated nucleus pulposus and degenerative joint disease (R. 729, 733).  Plaintiff's range of motion and muscle strength were decreased, as was his sensation at L4-5 (R. 683).

A consultative psychological examination in October 2006 concluded that the plaintiff suffered from pain disorder, depressive disorder, anxiety disorder, residual effects of his physical injuries, psychological effects stemming from his occupational

problems, and had a current Global Assessment of Functioning Score of 50 (R. 353).

Dr. John Rogers noted the quality of plaintiff's daily activities was "below average"

and that the plaintiff walked bent over (R. 353).  He found the plaintiff's mental

impairment to be "severe" (R. 354), and to have a restricted affect and a depressed

mood (R. 352).

## Standard of Review

In a Social Security case, the initial burden of establishing disability is on the

claimant, who must prove that due to a mental or physical impairment he is unable

to perform his previous work.  *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.1987).

If the claimant is successful, the burden shifts to the Commissioner to prove that the

claimant can perform some other type of work existing in the national economy.  *Id.*

This court's review of the factual findings in disability cases is limited to

determining whether the record contains substantial evidence to support the ALJ's

findings and whether the  correct legal standards were applied.  42 U.S.C. § 405(g);

*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971); *Martin v. Sullivan*,

894 F.2d 1520, 1529 (11th Cir.1990).  "Substantial evidence" is generally defined as

"such relevant evidence as a reasonable mind would accept as adequate to support a

conclusion."  *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v.*

*NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206 (1938)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir.1996); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983).

This court also must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir.1988); *Bridges v. Bowen,* 815 F.2d 622, 624 (11th Cir.1987); *Davis v. Shalala*, 985 F.2d 528 (11th Cir.1993). No presumption of correctness applies to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *Brown v. Sullivan*, 921 F. 2d 1233, 1235 (11th Cir.1991); *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir.1991). Furthermore, the Commissioner's "failure to ... provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius*, 936 F.2d at 1145-1146.

When making a disability determination, the ALJ must consider the combined effects of all impairments. *Davis v. Shalala*, 985 F.2d at 534; *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir.1990); *Walker*, 826 F.2d at 1001. When more than one impairment exists, the plaintiff may be found disabled even though none of the impairments considered alone would be disabling. *Id*. The ALJ must evaluate the combination of impairments with respect to the effect they have on the plaintiff's ability to perform the duties of work for which he or she is otherwise capable. *Lucas*

*v. Sullivan*, 918 F.2d 1567, 1574 (11ᵗʰ Cir.1990).  Merely reciting that the plaintiff's impairments in combination are not disabling is not enough.  The ALJ is required to make specific and well articulated findings as to the effect of the combination of impairments.  *Walker*, 826 F.2d at 1001.

## Legal Analysis

The medical records in evidence reflect the plaintiff has been treated for chronic back pain by a pain management specialist for more than seven years with no improvement.   A consultative psychologist rated the plaintiff's depression as producing a GAF of 50.[6]   Yet the ALJ has twice found the plaintiff capable of performing substantial gainful employment, eight hours a day, five days a week.

In his second opinion, the ALJ found the plaintiff suffered from degenerative disc disease with epidural fibrosis, status post bilateral laminectomies at L4-5, small central subligamental disc herniation at L3-L4; obesity; pain disorder; depressive disorder; and anxiety disorder, which are severe impairments, but none of which, singly or in combination, met or medically equaled the criteria of any of the listing of Impairments found in 20 CFR 404, Subpart P, Appendix 1 (R. 442-443).

---

[6]GAF is a standard measurement of an individual's overall functioning level with respect to "psychological, social, and occupational functioning." American Psychiatric Assoc. Diagnostic and Statistical Manual of Mental Disorders at 30 (4th ed.1994). A GAF score of 41–50 reflects "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSMIVTR") 34 (4th ed. text rev.2000).

The ALJ considered the plaintiff's subjective complaints of pain, but found the plaintiff's testimony about his pain to be not credible.  In considering solely the medical records generated prior to the date plaintiff last worked, the ALJ acknowledged medical evidence that:

> the claimant returned November 21, 2003 with "mildly positive" straight leg raising on the left "with some propagation of left buttock pain and some numbness down the anterior lateral aspect of his leg....When the claimant returned on December 5, 2003, Dr. Wade stated that on follow-up magnetic resonance imaging he did not "see any recurrent signs of disc herniation, stenosis or any new findings that would have any bearing on his sciatica."  He further stated: "I do think it is probably inflammation given the fact that he is getting a great deal of pain and discomfort around the sciatic distribution," and he recommended a pain management program.

R. 449.  While the ALJ recorded these findings, and stated no reason to disregard the same, he failed to take Dr. Wade's acknowledgment that the plaintiff "is getting a great deal of pain and discomfort..." into account.   The ALJ continued his examination of Dr. Wade's records, noting:

> The plaintiff can return to work under the current FCE guidelines.  He does not have a surgical problem."  He referred the claimant for pain management, noting "I do not have a surgical solution for him."

R. 449.  The ALJ assigned the opinions of Dr. Wade, from 2004, "substantial weight" (R. 450).  The plaintiff did return to work under the FCE guidelines, and continued to work until 2006 when his employer would no longer provide him with a job that both met those restrictions, and that he did not have to work on a full-time basis.

15

The ALJ also noted the additional lumbar disc herniation discovered after the FCE evaluation in June 2004.  However, the ALJ then states, even given an additional herniation, nothing supports the plaintiff's allegations of debilitating pain (R. 450). Thus having determined that Dr. Wade's opinion that the plaintiff could return to work under the June 2004 FCE limitations is entitled to substantial weight, the ALJ essentially adopts those limitations in his questions to the VE and in his findings of what the plaintiff can do, without regard to any medical findings post-dating 2004.

The ALJ determined that the plaintiff had a residual functioning capacity to perform work at the "light" level, with further specific requirements of no lifting more than 15 pounds occasionally and 10 pounds frequently, sit six out of eight hours total and 45 minutes at a time; stand four hours total and no more than 30 minutes at a time, and walk two hours total and no more than 30 minutes at a time, with only occasional stair climbing, kneeling, crouching and stooping, with no ladders, crawling, heavy vibrations, unprotected heights or temperature extremes[7] (R. 451). Based on the ALJ's conclusion that the plaintiff could perform such work, he determined any testimony otherwise was not credible (R. 451).  Specifically, the ALJ found plaintiff's testimony that some days he could not get out of bed and that he

---

[7]The court has no means by which to determine if the ALJ considered the plaintiff's use of a cane or even need of a cane, in ascribing limitations, as the ALJ never mentioned in a hypothetical use of a cane, an antalgic gait, or that numerous doctors commented that the plaintiff walked bent over.

needed to recline during the day not credible because there were "no supporting documentation in the medical records of such limitations" (R. 451).   The court finds such logic nonsensical, as plaintiff's description of his limitations from pain would not have "supporting documentation in the medical records."

Having been instructed to properly apply the pain standard, the ALJ has failed to do so.   In the Eleventh Circuit, a plaintiff may establish disability through his or her own testimony of pain or other subjective symptoms. *See Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir.2005); *Foote v. Chater*, 67 F.3d 1553, 1560–61 (11th Cir.1995). The ALJ must consider a plaintiff's testimony of pain and other subjective symptoms where the claimant meets the three-part "pain standard." *See Foote*, 67 F.3d at 1560.   Under that test, evidence of an underlying medical condition must exist.   *Id*.   If that threshold is met, then there must be either objective medical evidence that confirms the severity of the alleged pain or symptoms arising from the underlying medical condition, or evidence that the objectively-determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain or symptoms. *Id.* A plaintiff's subjective testimony supported by medical evidence that satisfies our pain standard is sufficient to support a finding of disability. *Id*. at 1561.   The evidence here reflects multiple medical conditions which can cause severe pain, as well as plaintiff's other symptoms.   Plaintiff has been diagnosed with

17

a herniated disk and degenerative disc disease (R. 257-261, 480, 733); mild spondylosis at C3-C5 (R. 212); ankylosing spondylosis (R. 62); chronically degenerated L3-4 and L4-5 intervertebral discs and tissue surrounded the L5 nerve root (R. 253); depression,  tenderness and trigger points were noted, decreased reflexes in his knees and ankles (R. 257-261);  mild to moderate degenerative joint disease at Thoracic 2-3, Thoracic 3-4, and Thoracic 11-12 (R. 721); herniated nucleus pulposus in his lumbar back at L4-5 (R. 713, 718, 720, 729, 733); a small central herniation at the L3-L4 intevertebral disc and post-surgical epidural scarring at L4 (R. 679); obvious desiccation and degeneration of the L3 and L4 intevertebral discs with small subligamental herniations at both levels (R. 679); and lumbar radiculopathy (R. 699, 700).

As here, where the record shows that the claimant has a medically-determinable impairment that could reasonably be expected to produce his symptoms, the ALJ must evaluate the intensity and persistence of the symptoms in determining how they limit the claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1). In doing so, the ALJ considers all of the record, including the objective medical evidence, the claimant's history, and statements of the claimant and his doctors. *Id*. § 404.1529(c)(1)-(2). The ALJ may consider other factors, such as: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms;

(3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of the claimant's medication; (5) any treatment other than medication; (6) any measures the claimant used to relieve her pain or symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to her pain or symptoms. *Id.* § 404.1529(c)(3). The ALJ then will examine the claimant's statements regarding her symptoms in relation to all other evidence, and consider whether there are any inconsistencies or conflicts between those statements and the record. *Id.* § 404.1529(c)(4).

   If the ALJ decides not to credit the claimant's testimony as to his subjective symptoms, the ALJ must articulate explicit and adequate reasons for doing so or the record must be obvious as to the credibility finding. *See Foote*, 67 F.3d at 1561–62. The ALJ's articulated reasons must also be supported by substantial evidence. *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1532 (11th Cir.1991).

   Here, the ALJ bases his decision that the medical records do not support the level of pain alleged by the plaintiff on the fact that the ALJ himself could not decipher those records.  Admittedly, much of Dr. Beretta's records are hard to read. The plaintiff's counsel took the extraordinary step of having those records transcribed.  However, the ALJ then still finds those records not to be worthy of credence, because the transcriptions may be "interpretive" and leave "too much room

for interpretation"[8] (R. 454).   The court is of the opinion that a finding of messy handwriting does not provide substantial evidence for an ALJ to wholesale ignore the records of a treating physician, who treats the plaintiff for the very thing for which he claims disability.   Certainly, the ALJ should not discount diagnoses such as lumbar radiculopathy (R. 699, 700) because he cannot easily read the medical records.   The court notes that these 2007 and 2008 diagnoses of lumbar radiculopathy are wholly supported by Dr. Wade's 2004 finding that the plaintiff's pain is sciatic in nature, both of which are symptoms of nerve root compression.   *See e.g.*, http://www.spine-health.com/conditions/lower-back-pain/lumbar-radiculopathy

Although required by the regulations, the ALJ similarly failed to consider the plaintiff's activities of daily living.   In his 2006 report the plaintiff relayed that he needed help getting in and out of the tub, that shaving was difficult because it required him to stand, that his wife has to bring his meals to him, he can no longer stand long enough to prepare a meal, he cannot clean, he cannot do laundry or mow grass with a riding mower, he is unable to walk through a store and if he goes, he uses an electric cart, he is unable to load or unload groceries, and he cannot drive for more

---

[8]The court agrees that the transcriptions of Dr. Beretta's notes are not perfect.   For example, in the transcription of the note from September 2009, the word "chronic" is omitted from the transcribed version noting plaintiff's "history of low back pain" (R. 689).   The original of that record clearly reflects Dr. Beretta's statement that the plaintiff has a "history of chronic low back pain" (R. 690).   While Dr. Beretta's records are certainly hard to decipher, they are not wholly illegible.

than fifteen minutes at a time (R. 176-180). A second daily activities questionnaire, completed by his former supervisor, echos the plaintiff's own statements. That supervisor reported the plaintiff spends his days "sitting around doing very little;" that he does not shave as often; that sometimes the plaintiff needs no help and sometimes a lot of help to go outside; that he has no recreational activities or hobbies; that he is sometimes irritable and sometimes depressed, that he does not go to church, that he has trouble remembering things and has concentration problems from his medications and that he cannot do a regular job (R. 182-185).

The regulations also require the ALJ to consider the location, duration, frequency, and intensity of the claimant's pain or other symptoms; and any precipitating and aggravating factors. The plaintiff testified that on a "good day" he can push himself into being active for two to three hours, but then must rest. He related during the second hearing that he was unable to stand for a 20 minute service for his daughter's dedication (R. 488). He is prescribed Cymbalta,[9] Celebrex,[10] Lortab 10mg,[11] and Ambien[12] (R. 682). The plaintiff also testified that he uses a

---

[9]Cymbalta is indicated for the treatment of major depressive disorder (MDD) and for the treatment of generalized anxiety disorder (GAD).http://www.cymbalta.com/Pages/index.aspx

[10]Celebrex is a nonsteroidal anti-inflammatory drug (NSAIDs). It works by reducing hormones that cause inflammation and pain in the body. Celebrex is used to treat pain or inflammation caused by many conditions such as arthritis and ankylosing spondylitis. http://www.drugs.com/celebrex.html

[11]Lortab is a narcotic pain reliever mixed with acetaminophen to increase the effect of the narcotic, and is used to relieve moderate to severe pain.

traction unit and has had a TENS unit.  These treatments are documented in Dr.

Beretta's records.  The ALJ chose to discount the length of time the traction unit

requires each day on the basis that Dr. Levine did not support its use (R. 454).

However, Dr. Levine is an orthopedic surgeon, and not a pain specialist.  Plaintiff's

treating orthopedic surgeon, Dr. Wade, sent the plaintiff to Dr. Beretta for pain

management.  Hence, while the court appreciates that different doctors may adopt

differing treatment methods, the use of traction clearly falls outside of Dr. Levine's

realm of expertise, but within Dr. Beretta's.  *See id.* § 404.1529(c)(3). Specialists on

issues within their areas of expertise are entitled to more weight than non-specialists.

*See* 20 C.F.R. § 404.1527(c)(1), (2) & (5); see also *Davis v. Barnhart,* 186 Fed. Appx.

965, 967 (11th Cir.2006); *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir.1987). This

is especially true where, as here, the record wholly lacks any evidence which

contradicts such opinions.  While an ALJ is free to reject the opinion of any physician

when the evidence supports a contrary conclusion, *Sryock v. Heckler*, 764 F.2d 834,

835 (11th  Cir.1985), the sole basis for such rejection cannot be merely the ALJ's

opinion that the conclusion is wrong. *See Crawford v. Comm'r of Soc. Sec*., 363 F.3d

1155, 1158, 1160 (11th  Cir.2004) (holding that the ALJ did not err in relying on

---

http://www.drugs.com/search.php?searchterm=Lortab+10%2F500

[12]Ambien is a sedative used to treat insomnia. http://www.drugs.com/ambien.html

consulting physician's opinion where it was consistent with medical evidence and findings of the examining physician). *See also Freeman v. Schweiker*, 681 F.2d 727 (11th Cir. 1982).  A hearing officer "may not arbitrarily substitute his own hunch or intuition for the diagnosis of medical professional." *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992).

More egregious is the ALJ's disregard of Dr. Beretta's seven years of treatment notes because they are hard to read.  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical issues at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c). Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); see also 20 C.F.R. § 404.1527(c)(2).

The ALJ discounted or ignored every indicia of pain he was supposed to consider under the regulations.  Rather than actually apply the pain standard, the ALJ started from the premise that the plaintiff was not disabled because seven years prior

to the hearing, Dr. Wade returned the plaintiff to work, also based on a FCE completed seven years prior. Thus, the ALJ continued, any evidence which contradicted the foregone conclusion that the plaintiff could work was deemed not credible. This is not proper application of the pain standard.

Since the plaintiff had stopped working in 2006, no doctor has opined that the plaintiff should return to work. Given that the plaintiff is not working, no doctor would have any reason to place limitations on the plaintiff's ability to work. No doctor has stated that the plaintiff was malingering or drug seeking.

Also wholly ignored by the ALJ was the opinion of the consultative examiner, who opined the plaintiff had a GAF of 50. The sole assessment of plaintiff's depression and mental state comes from a consultative examination by Dr. Jon Rogers, Ph.D. (R. 350). In Dr. Rogers' opinion, the plaintiff suffers from pain disorder with psychological features, depressive disorder, and anxiety disorder (R. 353). The ALJ noted only that "Dr. Rogers found that although the 'extent of his mental impairment is severe" the claimant "should be able to perform most activities of daily living"[13] (R. 443). The ALJ provides no further explanation of this cryptic analysis of Dr. Rogers' opinion. The ALJ then finds Dr. Rogers' opinion unworthy

---

[13]Being able to perform "most" activities of daily living is not an indication of the ability to perform work related activity, but rather an indication of one's ability to bathe, dress, and feed oneself.

of credence, finding it was entitled to less weight than that of Dr. Robert Estock, the state agency psychiatric consultant (R.444).

Even with all of the above concerns with the decision of the ALJ, the court finds most compelling that this case must be reversed Dr. Levine's testimony that "epidural fibrosis essentially is equivalent to arachnoiditis" such that it would equal Listing 1.04B (R. 500). The ALJ found the plaintiff did suffer from epidural fibrosis (R. 442), which would require a finding the plaintiff meets Listing 1.04B. The ALJ then states he "adopts the opinion of the medical expert, Dr. Levine, who found that the claimant's impairments did not meet or equal a listed impairment"[14] (R. 444).

The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-1146 (11th Cir.1991). Under the "treating physician rule," an ALJ may not reject a treating physician's opinion without good cause. *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir.1991). Good cause exists if the opinion is wholly conclusory, unsupported by the objective medical evidence in the record, inconsistent within itself, or appears to be based primarily on the patient's subjective complaints. *Id*.; see

---

[14]The court notes that the symptoms required by Listing 1.04A are all found in the records before this court. Hence, if the substantial evidence before this court did not require a finding that the plaintiff equaled Listing 1.04B, the court would remand this action for proper consideration of Listing 1.04A.

*Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159-60 (11th Cir.2004); *Lewis*, 125 F.3d at 1440.   None of these exceptions is relevant here.   All of the treating physicians reach the same conclusions as to the plaintiff's medical problems.   All of the medical records before this court demonstrate that each of the plaintiff's treating physicians took his complaints seriously and have tried to find both a source of and a treatment for the plaintiff's symptoms.

Just as an ALJ cannot arbitrarily reject uncontroverted medical testimony. *Walden v. Schweiker*, 672 F.2d 835, 839 (11th Cir. 1982); *see also Flynn v. Heckler*, 768 F.2d 1273, 1275 (11th Cir. 1985), he also cannot reject the treating physicians' opinions in favor of a non-examining doctor.   "A corollary to the treating physician rule is that the opinion of a non-examining doctor by itself cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis." *Hidalgo v. Bowen*, 822 F.2d 294, 297 (2nd Cir.1987); citing *Strickland v. Harris*, 615 F.2d 1103, 1009 (5th Cir.1980) ("the reports of physicians who did not examine the claimant, taken alone, would not be substantial evidence on which to base an administrative decision).   Hence, by accepting Dr. Levine's opinions over those of Dr. Beretta, the ALJ committed error.   His finding that the plaintiff is not disabled is against the substantial weight of the evidence.   This court finds that the substantial weight of the evidence dictates a finding that the plaintiff has been under a disability

since February 2006 and therefore the plaintiff is entitled to benefits in accordance with this determination.

### Conclusion

When evidence has been fully developed and unequivocally points to a specific finding, the reviewing court may enter the finding that the Commissioner should have made. *Reyes v. Heckler*, 601 F.Supp. 34, 37 (S.D.Fla.1984). Thus, this court has the authority under 42 U.S.C. §405(g) to reverse the Commissioner's decision without remand, where, as here, the Commissioner's determination is in plain disregard of the overwhelming weight of the evidence. *Davis v. Shalala*, 985 F.2d at 534; *Bowen v. Heckler*, 748 F.2d 629, 636 (11th Cir.1984). Based on the lack of substantial evidence in support of the ALJ's findings, it is hereby **ORDERED** that the decision of the Commissioner is **REVERSED.** This case is **REMANDED** to the Agency to calculate the plaintiff's monetary benefits in accordance with this Opinion.

**DONE** and **ORDERED** the 23rd day of May, 2013.

INGE PRYTZ JOHNSON
SENIOR U.S. DISTRICT JUDGE